Filed 12/4/23  P. v. Steele CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CLEO STEELE, <br><br> Defendant and Appellant. | B314112 <br><br> (Los Angeles County Super. Ct. No. BA450440) <br><br> ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING <br><br> NO CHANGE IN JUDGMENT |

THE COURT*:

The opinion filed November 9, 2023, in the above-entitled matter is ordered MODIFIED as follows:

1.     On page 16, in the third full paragraph, after the fourth sentence ending with the word "anything," add the following: "There was a juror wearing what appellant believed was a Sheriff's shirt, and appellant asserted this meant the juror would favor law enforcement."

2.     On page 18, to the fourth full paragraph, after the second sentence, add the following: "The court asked the juror if he could be fair because of his occupation, and the juror responded 'I don't know.' When asked if he could be fair and impartial, the juror stated, 'Not really, it's really hard with a mask.'"

3.    On page 18, in the fourth full paragraph, add to the sentence reading "The court advised the parties that it intended to remove Juror No. 7 from the jury" the following clause at the end of the sentence: "telling defense counsel that "[t]his person has a bias. . . . in favor of police officers."

These modifications do not change the judgment.

The petition for rehearing is DENIED.

_____
*CURREY, P.J.              COLLINS, J.                    MORI, J.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B314112 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA450440) |
| v. | |
| CLEO STEELE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge. Affirmed in part and reversed and remanded in part.

Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Cleo Steele, a member of the Underground Crips gang, appeals his June 2021 convictions for two counts of murder (Pen. Code, § 187, subd. (a)),[1] four counts of attempted murder (§§ 664, 187, subd. (a)), related weapons charges (felon in possession of a handgun, § 29800, subd. (a)(1)), gang enhancements (§ 186.22, subd. (b)), weapons enhancements (§ 12022.53, subd. (e)(1)), and special circumstance allegations (§ 190.2), all stemming from two separate gang-related shooting incidents in March and June 2015. On appeal, he principally challenges the admission of evidence and makes numerous claims of ineffective assistance of counsel. We reverse and remand for a retrial of the gang enhancements and gang special circumstance allegations in light of Assembly Bill No. 333 (Assem. Bill No. 333), effective January 1, 2022. In all other respects the judgment is affirmed.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]**

### A. Rivalry Between Crips and Hoovers.

Appellant and the victims were members of two rival gangs. Appellant belonged to the Rollin 100s Underground Crips. The victims belonged to a gang known as Hoovers, who were the Underground Crips' "worst enemy." Underground Crips were expected to fight Hoover members on sight, including by using a weapon.

---

1 All statutory references are to the Penal Code unless otherwise noted. Unless otherwise noted, the factual summary is derived from trial testimony.

2 This action resulted from the consolidation of two related actions, Case Nos. BA450440 and BA450470.

**B. March 12, 2015 Shooting of Cleveland Ross, Jr. (Ross, Jr.).**

One of the murders for which appellant was convicted was the March 12, 2015 shooting of Cleveland Ross, Jr.

### 1. *Prosecution Case.*

On the day of the shooting, Quincy Jefferson, a member of the Underground Crips, was at his girlfriend's house near 105th Street and Normandie Avenue in Los Angeles. While there, Jefferson encountered appellant and other Underground Crips: Bill Shepard, Johnnie Johnson, and another person known as Demetrius. A car arrived with additional Underground Crips members whose gang monikers are "Infant Toon" and "Baby Hound." They told the group that they had just seen Ross, Jr. at a nearby AutoZone store. Ross, Jr. was well known in the neighborhood.

The AutoZone store was approximately 5 to 10 minutes away near the intersection of Century Boulevard and Hoover Street, and was in Hoover territory, Appellant asked the group what they wanted to do, and they responded, "'let's go over there.'"

The group got into three cars to go the AutoZone. They used the "car method," a gang technique whereby the front and rear cars protected the middle car, which contained the gunman. The method ensured the safety of the gunman and facilitated escape from law enforcement. Infant Toon went with Jefferson in the lead car, which was Jefferson's silver Chrysler 300. Johnson got into his BMW, and Demitrius followed in another gang member's borrowed burgundy Buick. Appellant was in the Buick.

3

Ross, Jr. had gone to the AutoZone with his father, Cleveland Ross, Sr. (Ross, Sr.). They needed to fix the battery on Ross, Jr.'s car and were parked near the front door.

After arriving at the AutoZone, Jefferson circled the parking lot a couple of times. He saw Johnson's BMW and the Buick arrive. The three cars parked in the AutoZone lot. Jefferson saw Ross, Jr. in the parking lot attempting to start his car. Jefferson got out of his car and walked towards Johnson's BMW.

Jefferson saw appellant reach over the Buick and shoot Ross, Jr. with a .357 revolver. Jefferson ran back to his car and followed the Buick out of the lot.[3]

Ross, Jr. was shot outside the AutoZone. Ross, Sr., who was still in the store when shots rang out, found Ross, Jr. on the ground next to his BMW.

Derrick Jones, who was in line in the AutoZone, heard about seven shots and looked up and saw the shooter. Jones described the shooter as a bald, "brown-skinned" African American. Jones recognized appellant in court as the shooter, although he had previously been unable to identify appellant from a police photo array containing appellant's picture.

Bystanders Michael Marlete and his wife Daniella Rangel described hearing multiple gunshots. One witness observed the shooter had a "Clint Eastwood" style gun, and that the shooter

---

3    Jefferson was initially charged with murder and conspiracy to commit murder for the offenses committed on March 12, 2015, in Case No. BA450470. At first, he denied his involvement to police. Jefferson later pleaded no contest to voluntary manslaughter and received an 11-year sentence. At the time of trial, Jefferson was no longer a member of the Rollin 100s Underground Crips and testified against appellant.

4

was aiming at Ross, Jr.'s car. The shooter was described as dark (black or Mexican), about 40 years old, bald, with round glasses. However, neither Marlete nor Rangel could identify appellant from a six-pack photo array, and Rangel claimed she did not see the shooter.

After the shooting, the three cars returned to the home of Jefferson's girlfriend.

Police obtained surveillance videos from nearby businesses. A car wash video showed the three cars entering the AutoZone parking lot. Cell phone data established appellant was in the area of the house where the Underground Crips gathered before and after the shooting. Data from the day of the shooting showed appellant's phone in the general area of 105th and Normandie at about 4:20 p.m.; near the crime scene at 4:40 p.m.; and near 105th and Normandie at 5:15 p.m.

## C. The June 10, 2015 Shooting of Mykiel Washington, Michael Baptist, Larail Williams, Kevin Carr, and Lisa Jack at the Monarch Liquor Store.

On June 10, 2015, a shooting occurred at the Monarch Liquor Store in the area of 88th Street and Vermont Avenue in Los Angeles.

### 1. *Victim and Eyewitness Testimony.*

Michael Baptist was in his Dodge Dart at a liquor store with his friends Mykel Washington, Larail Williams, and Kevin Carr. While Baptist went into the liquor store to get some cigarettes, Washington got out of the car and went across the street to speak with someone.

Baptist got back into his car and saw a car drive by with three men who were not from the area. He told Washington they

5

needed to leave and heard shots. Baptist put his car in reverse, but a white Chevy Malibu and another car sandwiched him in. Baptist heard more shots. A bullet went through the door of his car, hit his leg, and struck the gear shift. Baptist could not move his car because the gear shift had shattered. The Chevy Malibu drove away. Carr got out of the car and ran.

Baptist ducked for cover and was shot twice more in the leg and twice in the back. He heard someone say, "you next," before he was shot in the cheek. Baptist did not see who shot him.

Baptist saw Washington across the street, staggering. Washington died from multiple gunshot wounds.

Lisa Jack was sitting nearby, reading a book, when she heard gunshots. She got on the ground, saw blood on her hand, and realized she had been shot in the hip. Jack did not see the shooter.

Kevin Carr, a Hoover, was shot in the leg. He went to the hospital and had surgery. Later, he stated he did not remember the shooting. Carr also stated he did not remember meeting with Detective Hecht or identifying anyone from a photographic array. Carr said he did not know appellant.[4] However, Detective Hecht testified at trial that he met with Carr at the hospital, and Carr told him that he was sitting in the car at the Monarch Liquor Store when he saw someone wearing gold rimmed glasses and dressed in a hoodie running toward him. Several months later, Carr identified appellant as the shooter from a photographic array.

A bus driver was driving the Vermont line on the day of the shooting. He stopped at the red light at 88th and Vermont near

---

4	Carr was unavailable at trial, and his preliminary hearing testimony was read to the jury.

the Monarch Liquor Store. He heard gunfire and saw a male with gold-framed glasses jump into the front passenger seat of a brown car. As the car drove past the bus, he saw appellant. The bus driver identified appellant as the shooter from a photographic array and at trial. However, he conceded on cross-examination he had not identified appellant at the preliminary hearing, instead identifying a co-defendant.

## 2. Patrick Bell's Testimony.[5]

Patrick Bell drove the White Malibu that sandwiched in Baptist's car at the Monarch Liquor Store the day of the shooting. Bell had been a member of the Rollin 100s Underground Crips. Bell knew appellant because they were cousins by marriage and had gone to school together. Although members of the same gang, they did not hang out. The area of the shooting was in Hoover and Eight Trey Gangster territory. Both gangs were enemies of the Underground Crips.

The afternoon of the shooting, Bell was in the area to visit his grandmother. He saw two cars he recognized—a brown car belonging to Edward Furdge (a Saturn), an Underground Crip, and a Chevrolet Monte Carlo belonging to Wychane Randle.[6] Bell, who was traveling in the opposite direction, saw someone in one of the cars wave to him to come over. Bell did a U-turn and got

---

5 Bell was initially charged with murder but obtained a plea bargain in exchange for his testimony against appellant.

6 In case No. BA450550, appellant, along with co-defendants Wychane Randle, Marcus Broadnax, and Edward Furdge, was charged with murder, conspiracy to commit murder, and four counts of attempted murder. These co-defendants either reached dispositions of their cases, or the proceedings were severed.

behind the two cars and started to follow them. The cars moved into Hoover territory.

Bell followed the cars to see what they were doing, not necessarily to lend assistance in the rival gang territory. They stopped at a light as they traveled on 88th Street. Bell saw appellant, wearing a hoodie, get out of one of the cars, and start shooting at people with a "20-shot clip" handgun. Bell backed up and got out of the way. Although he admitted he pulled up next to a Dodge Dart, Bell denied sandwiching in any of the cars.

Bell went back to the "hood." Detectives questioned Bell about the shooting and told him they had video of his license plate. Bell, who had 10 brothers, claimed multiple people drove his car. Bell did not want to be a "snitch."

After Bell realized other people were talking to police and had told police Bell was present at the shooting, he realized he could not lie anymore. He said police had raided his house and told him the Department of Children and Family Services would take his children.

Ultimately, Bell was charged as an accessory and decided to talk to police. He told them he was at the shooting and knew the shooter. Police circulated a sketch with appellant's likeness and Bell recognized appellant as the shooter. Bell told police that Furdge was driving and Marcus Broadnax was in the back seat.

At trial, Bell asserted he identified appellant to get out of custody. He said police offered him money and release from custody after he identified appellant. Further, after Bell identified appellant at the preliminary hearing, he received relocation assistance and financial support of approximately $17,000.

### 3. *Police Investigation.*

Sheriff's deputies recovered nine-millimeter shell casings and several bullet fragments in the street near the scene of the Monarch Liquor Store shooting. A Dodge Dart parked on 88th Street had eight bullet impacts to its exterior and interior. After impounding the car, police examined the car and found two bullet holes on the driver's door, blood on the driver's side door, and three bullet fragments inside the car. A brown car, a Saturn, was examined, and DNA found on an interior door handle matched Broadnax. A water bottle from the center console contained Furdge's DNA, and DNA on an orange soda bottle in the trunk matched Randle.

Over 20 spent 9-millimeter casings, all fired from the same gun, were recovered from the crime scene and the Dart. Bullets recovered from Washington's body and Carr were fired from the same weapon.

Cell phone records showed that just before 1:00 p.m. on June 10, 2015, appellant's cell phone was near the same house as it had been before and after Ross, Jr.'s murder. Between 12:00 p.m. and 12:39 p.m., Broadnax's phone was at the same location. Randle's phone was also located near the house and at the Monarch Liquor Store.

### D. Gang Testimony.

Deputy Sheriff Ernie Castaneda, a gang expert, testified that gangs value loyalty; "loyalty is everything." Further, "snitching" would result in "violent repercussions." The Underground Crips and Hoovers were "bitter rivals."

Gangs require members to "put in work," such as bringing in money and committing violent crimes against rival gang

members. Further, gang members must put in work to help create a violent reputation for their gang to garner "respect."

Gang territory is the area the gang claims for itself. To protect its territory, a gang will use graffiti and carry firearms. Often, a gang member will "go on a mission," meaning the gang member will enter rival territory to commit a crime against a rival gang member.

Ross, Jr. was well known by his fellow gang members and rivals. The Hoovers controlled the area where Ross, Jr. was shot, while the Hoovers and an ally, the 8-Trey Gangster Crips, controlled the area where Washington was shot. Ross, Jr. was a Hoover and Washington was a member of the 8-Trey Gangsters. The area of 105th Street and Normandie was claimed by the Underground Crips, while the area to the east was claimed by the Hoovers.

Deputy Castaneda knew Johnson, Broadnax, Furdge, Randle, and appellant were all Underground Crips.

As discussed more thoroughly *post,* Castaneda reviewed appellant's Facebook posts and analyzed the meaning of the slang used in them. According to Castaneda, appellant's tattoos indicated he was an Underground Crip, and his tattoos and the nature of his Facebook posts indicated he was actively involved with his gang.

In a hypothetical based on the facts of the shootings in this case, Castaneda opined that the shootings were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist gang members in criminal conduct. Castaneda believed the shootings benefited the gang because their commission in rival territory in broad daylight created a violent reputation for the

gang among members of rival gangs and the general community, allowing the gang to get away with future crimes by intimidating the community. People aware of the crimes are afraid to report them because they remember the murders the gang committed.

A gang that commits a crime might expand its territory, resulting in more income, respect, and the boosting of the gang's reputation. Rival gang members will know that if they do anything to the gang, something "really bad" will happen to them. The shootings also increased the shooter's stature in the gang, which leads to becoming a shot caller who receives proceeds from the gang's crimes.

Further, in Castaneda's opinion, the crimes in this case were committed in association with a gang because three vehicles were involved and each vehicle had a separate role; gang members commit crimes with other people they trust because this helps them evade law enforcement, and they want other members to witness the crime so they can increase their respect within the gang.

Appellant's counsel stipulated that the Underground Crips were a criminal street gang as defined in sections 186.22 and 190.2, subdivision (a)(22).

### E. Defense Case.

Johnnie Johnson testified he had known appellant a long time. On March 12, 2015, Johnson drove into the AutoZone, following Jefferson's Chrysler. Johnson parked next to the wall and remained in his car. Johnson heard shots and saw the shooter. He did not recognize him, and he testified it was not appellant. During a police interview, Johnson claimed he did not know appellant. Johnson later admitted knowing appellant.

Johnson told police the cars involved in the shooting were a red Buick, silver Chrysler, and his car.

Johnson admitted he lied to police when he told them he did not know appellant. Johnson would not "snitch" on appellant. He denied going to the AutoZone to kill Ross, Jr. Instead, he had seen Jefferson's car, so he followed it to the AutoZone.

Johnson and appellant appear in photographs on Johnson's Facebook page. An Instagram post that included both Johnson and appellant included gang code meaning "Hoover Killer." In September 2015, Johnson and appellant were convicted of committing a home invasion robbery. Johnson stated he believed appellant was innocent of the charges.

### F.    Information, Verdict and Sentencing.

The amended Information filed June 10, 2015 in consolidated case Nos. BA450440 and BA450470, alleged as follows:

| Count | Section | Gang Enhancement | Offense | Date | Victim |
|---|---|---|---|---|---|
| 1 | 187 | 190.2, subd. (a)(22) 186.22, subd. (b)(1)(C) 12022.53, subds. (d) & (e)(1) | Murder | 6/10/15 | Mykiel Washington |
| 2 | 182/187 | 186.22, subd. (b)(1)(C) 12022.53, subds. (d) & (e)(1) | Conspiracy to Commit Murder | 6/10/15 | Mykiel Washington |

| Count | Section | Gang Enhancement | Offense | Date | Victim |
|---|---|---|---|---|---|
| 3 | 29800, subd. (a)(1) | 186.22, subd. (b)(1)(A) | Felon in possession of a firearm | 6/10/15 | |
| 4 | 664/187 | 186.22, subd. (b)(1)(C) 12022.53, subds. (d) &(e)(1) | Attempted Murder | 6/10/15 | Michael Baptist |
| 5 | 664/187 | 186.22, subd. (b)(1)(C) 12022.53, subds. (d) & (e)(1) | Attempted Murder | 6/10/15 | Lisa Jack |
| 6 | 246 | 186.22, subd. (b)(1)(C) 12022.53, subds. (d) & (e)(1) | Shooting at an Occupied Vehicle | 6/10/15 | |
| 7 | 664/187 | 186.22, subd. (b)(1)(C) 12022.53, subds. (d) & (e)(1) | Attempted Murder | 6/10/15 | Kevin Carr |
| 8 | 664/187 | 186.22, subd. (b)(1)(C) 12022.53, subds. (d) & (e)(1) | Attempted Murder | 6/10/15 | Larail Williams |
| 9 | 187 | 190.2, subd. (a)(22) 186.22, subd. (b)(1)(C) | Murder | 3/12/15 | Cleveland Ross, Jr. |

| Count | Section | Gang Enhancement | Offense | Date | Victim |
|---|---|---|---|---|---|
| | | 12022.53, subds. (d) & (e)(1) | | | |
| 10 | 182/187 | 186.22, subd. (b)(1)(C) 12022.53, subds. (d) & (e)(1) | Conspiracy to Commit Murder | 3/12/15 | Cleveland Ross, Jr. |
| 11 | 29800, subd. (a)(1) | 186.22, subd. (b)(1)(A) | Felon in Possession of Firearm | 3/12/15 | |

In addition to the multiple murder, gang special circumstance, and gang allegations, a prior serious felony conviction was also alleged. (§ 1170.12, subd. (b).)

A jury found appellant not guilty of the conspiracy allegations (Counts 2 and 10). The jury found appellant guilty of all other charges, and found the attempted murders of Baptist, Carr, and Williams were willful and premeditated. All gun enhancements and special circumstances were found true. The trial court found the prior conviction allegation true.

The trial court selected Count 5 (attempted murder of Jack) as the base count and imposed the midterm of 7 years, doubled to 14 years based on the prior strike, plus 25 years to life for the gun enhancement and 10 years for the gang enhancement.

The court imposed sentences of life without parole on Counts 1 and 9, plus an additional 30 years for the enhancements on those counts. On Counts 3 and 11, the court sentenced appellant to 28 months on each count, consisting of the midterm, doubled, plus a 1-year gang enhancement. On Counts 4, 7, and 8, the court sentenced appellant to 3 terms of life imprisonment

14

with a minimum parole eligibility term of 15 years, doubled to 30 years, plus an additional 30 years for the enhancements on each count. The court imposed and stayed sentence on Count 6, and ordered all sentences, other than on Counts 5 and 6, to run consecutively.

## DISCUSSION

## I.     MARSDEN MOTIONS

Appellant contends the trial court failed to sufficiently inquire into his conflicts with his appointed counsel and his complaints about counsel's performance. He also asserts this error was prejudicial because counsel ultimately rendered ineffective assistance.

### A.     Factual Background.

At trial, appellant made two *Marsden*[7] motions. The trial court denied both motions.

#### 1.     First Marsden Motion.

At the first *Marsden* motion, appellant complained he was uncomfortable with his appointed counsel and did not get along with them. During jury selection, appellant expressed concern about continuances given the age of his counsel (over 75 years old). The court responded it had known the lawyers for decades and they were "really very good" attorneys. The court informed appellant that issues with whether he could continue to be charged with the death penalty and COVID-19's effect on jury selection were going to cause unavoidable delays in starting trial. The court explained that even if it appointed a younger attorney

---

7     *People v. Marsden* (1970) 2 Cal.3d 118.

to represent appellant, a new lawyer would ask for and receive a couple of years to prepare for trial.

Subsequently, the court granted a continuance in light of the severity of COVID-19, the number of positive cases, and its concern for all parties. A jury pool would not be available under the circumstances. Appellant objected to the continuance because he still had concerns about the age of his counsel. The court advised appellant that no trials were being held. The trial court reiterated that "you've got the best. Right now, you have the best lawyers because of the nature of this case. You have the best lawyers that the state can give you."

The court told appellant that a continuance would be advantageous to him considering the likelihood that the prosecutor would forego the possibility of the death penalty. Appellant then consented to the continuance, and the prosecutor eventually stated that she would no longer be seeking the death penalty.

As jury selection proceeded, appellant made another *Marsden* motion. The court asked appellant if he wanted a different attorney, and appellant confirmed he did. When the court asked for his reasons, he responded he was uncomfortable, and he did not get along with his attorney. When the court asked appellant to explain, he answered there were "plenty of things [he had] seen in this case" and claimed his attorney had "no witnesses for [him] or anything." Further, appellant did not like counsel's questions during voir dire. The court inquired what appellant thought should be asked, to which appellant answered, "A lot of things." When the court gave him the opportunity to provide specifics, appellant replied that counsel should be asking more than just "because [appellant] is a gang member, can you

16

say 'not guilty?' It's far more things besides me being a gang member." Appellant further complained that counsel asked the same questions of all the jurors.

The court asked appellant which witnesses he would like his counsel to call, and appellant stated he wanted experts. "There's going to be witnesses here that say I did the crime. There's witness experts that would help him . . . . They're going to have experts, I guarantee. I don't have no one there to help me with this, man. I don't feel he's good enough at all. I am going up there with nothing. I could represent myself and not throw my life away."

The court denied appellant's *Marsden* motion, finding "[t]here is no constitutional right to a meaningful relationship between the defendant and his counsel. . . . . The fact that you don't trust your attorney and you don't get along with him is not sufficient to substitute an attorney. You don't have to get along with the lawyer. . . . [T]he fact that you disagree with the attorney regarding the trial tactics does not compel a change of attorneys. It's the attorney [who is] in charge." The court added, "I've known your lawyer for a long time . . . He knows what he's doing."

### 2. *Second Marsden Motion.*

Later during jury selection, appellant made another *Marsden* motion. Defense counsel told the court that appellant "just did say he doesn't like all the jurors." When the court asked about the problem, appellant stated his attorney was "uncoordinated when it comes to the jury things." Counsel could not keep track of juror numbers, and there were jurors appellant did not want on the jury.

During voir dire, several jurors revealed they had ties to law enforcement, were the victims of crimes, or had close relatives who were the victims of crimes.

On appeal, appellant complains about the following jurors:

(1) Juror No. 7 (Badge No. 9432). Juror No. 7 was a volunteer military police officer for the "State Guard." The juror stated he could be fair and impartial, lived in Los Angeles, was employed as an intermediate clerk for the Los Angeles County Public Health Department, was unmarried, and had never served as a juror.

Juror No. 7 confirmed that if he was not convinced beyond a reasonable doubt that appellant was guilty, he would acquit. He further confirmed he would not convict appellant based on appellant's being a gang member. However, after hearing the witnesses on the first day, Juror No. 7 had made up his mind. The court advised the parties that it intended to remove Juror No. 7 from the jury, and defense counsel stated, "I am not objecting if his mind is made up that [appellant] is guilty. If his mind is made up that [appellant] is not guilty . . . I am objecting and submitting." The court explained that discharge from a jury was appropriate where a juror prejudges a case without hearing all of the evidence. Juror No. 7 was excused.

(2) Juror No. 12 (Badge No. 3088). Juror No. 12's best friend's father had recently retired from the Los Angeles Police Department. The prospective juror did not believe that relationship would cause her to be unfair. The juror confirmed she would not convict based on the facts that appellant was charged with two murders and was a gang member.

(3)　Juror No. 1 (Badge No. 2447). Juror No. 1's brother was a sergeant for the Long Beach Police Department, but he did

not think anything about his brother's occupation would cause him to be unfair as a juror. He confirmed that he would not convict based on the facts that appellant was charged with two murders and was a gang member. The juror agreed that it was not part of his job to consider the consequences of finding someone guilty.

(4) Juror No. 3 (Badge No. 2922). Juror No. 3 had a murdered relative. She did not think that the murder would cause her to be unfair. In addition, the juror explained that she was employed as a dental assistant, had never served on a jury, was married to a truck driver, and had two children. Juror No. 3 understood that being charged with a crime did not equate to guilt. She further understood she could only convict if she was convinced someone was guilty beyond a reasonable doubt. Juror No. 3 stated that appellant's gang status would not cause her to find him guilty if the evidence did not satisfy the beyond a reasonable doubt standard.

(5) Juror No. 4 (Badge No. 1815). Juror No. 4's uncle was a police officer in Korea, but nothing about his uncle's occupation would cause him to be unfair. In addition, he explained that he lived in Burbank, worked as a medical assistant, was unmarried, had no children, and had never served on a jury. In response to a question from the prosecutor, Juror No. 4 stated that he would be able to reach a verdict with the other jurors based only on the evidence heard in court.

### 3. *Trial Court Ruling.*

The court denied the *Marsden* motion, explaining that defense counsel "chooses the jury." With respect to counsel's keeping track of juror numbers, the court explained, "because of COVID. . . . [W]e had brought in jurors in the morning and the

19

night and in the afternoon for voir dire for over a week. That's called the Batch System. And I wouldn't—it's not like the old days, where you had everybody in the box and all the jurors are present. Because of that, it's hard to keep track of all the jurors. You can see even the People, the DA, had to ask which day the juror was here."

The court continued, "When you say he is uncoordinated, I don't know what that means. He has jurors separated by days, and A.M. and P.M., and it's hard because not all jurors showed up at one time. It was unknown which jurors were from which group." Defense counsel added, "this is the best defense jury I have seen in years. I try one murder case after another, and this is one of the best."

## B.    Discussion.

Under *People v. Marsden*, *supra*, 2 Cal.3d 118, a defendant may request that the trial court replace appointed counsel upon a showing that the defendant has been denied effective representation of counsel. (*Id*. at pp. 123–124.) The rules governing *Marsden* motions are well established. When a defendant seeks substitution of appointed counsel pursuant to *Marsden,* "'the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.'" (*People v. Taylor* (2010) 48 Cal.4th 574, 599.) We review the denial of a *Marsden* motion for abuse of discretion. Denial is not an abuse of discretion unless the defendant has shown that a failure to

20

replace counsel would substantially impair the defendant's right to assistance of counsel. (*Ibid.*; *People v. Streeter* (2012) 54 Cal.4th 205, 230.)

During a *Marsden* hearing, the court ascertains the nature of defendant's allegations regarding counsel's performance, and determines whether the allegations have sufficient substance to warrant replacement of counsel. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 803.) There is no absolute right to substitute counsel. A trial court is required to substitute counsel in a situation where the record clearly shows that the first appointed counsel is not adequately representing the accused. (*Ibid.*) The trial court must also substitute counsel where it is demonstrated that counsel and defendant are embroiled in an irreconcilable conflict. (*People v. Abilez* (2007) 41 Cal.4th 472, 488.) We evaluate whether the error prejudiced defendant under the *Chapman* standard, and consider whether any error was harmless beyond a reasonable doubt. (*People v. Loya* (2016) 1 Cal.App.5th 932, 945; *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].)

Here, the record does not reflect that counsel was inadequately representing appellant. Nor does it demonstrate counsel and defendant were embroiled in an irreconcilable conflict. Further, the record does not show that failure to replace counsel would impair appellant's right to assistance of counsel.

After defendant's first request, the trial court made a detailed inquiry into appellant's reasons. Appellant complained counsel was not going to call witnesses, and counsel was not asking the "right" questions during voir dire. The court inquired of the questions appellant wanted counsel to ask. Appellant stated "a lot of things," but when pressed for more specifics, he

had none. Given appellant's stated reasons for discharging his counsel, the court was within its discretion to deny the motion.

Regarding appellant's second motion, the record demonstrates defense counsel was not deficient in his handling of voir dire. Defense counsel stated it was one of the best juries he had obtained. Second, there is nothing in the voir dire transcript to indicate any of the remaining jurors should have been challenged for cause. Juror No. 7 was removed after indicating he would prejudge the case. The remaining jurors all indicated that despite their ties to law enforcement, they would not prejudge the case or convict appellant solely because he was a gang member. The questioning and discussion were sufficient to expose potential bias.

As discussed at length *post,* we have concluded appellant did not receive ineffective assistance of counsel.

## II.    SUFFICIENCY OF EVIDENCE ON COUNT 5, ATTEMPTED MURDER OF LISA JACK.

Appellant contends the evidence did not establish he specifically intended to kill Jack because she was a bystander, not appellant's intended target. We disagree.

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) The mental state required for attempted murder differs from that required for murder. Attempted murder requires a showing of express malice. Murder does not require intent to kill as implied malice—a conscious disregard for life—is sufficient. However, attempted murder requires the specific intent to kill. (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

We review the whole record in the light most favorable to the judgment to determine whether any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) We presume the existence of every fact the jury could reasonably have deduced from the evidence in support of the judgment and "'accept logical inferences that the jury might have drawn from the circumstantial evidence.'" (*Id.* at p. 357.) We reverse for insufficient evidence only where ""'upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict." (*Ibid.*)

Here, appellant argues, Jack testified she was looking at her book when she was suddenly hit by a bullet; yet there was no evidence she belonged to a gang, looked like she was a member of a gang, or was the target of the shooting. Rather, the shooter shot at Washington as he moved towards the Dart, and fired at Washington's companions, all gang members. This evidence, he contends, establishes Jack was nothing more than a bystander and he never harbored any express malice towards her.

We agree with respondent that there is sufficient evidence in the surveillance video to support an inference that appellant acted with specific intent to kill. The video shows appellant raise his gun, aim at Jack, and shoot the gun. Additionally, the evidence established appellant had entered rival gang territory with intent to shoot rival gang members; as a result, the jury could have concluded that Jack, given her physical proximity to such gang members, was also appellant's intended target.

## III. CROSS-EXAMINATION OF PATRICK BELL.

Appellant contends Patrick Bell had a history of lying, yet the trial court improperly restricted appellant's cross-

examination of Bell, and the error was prejudicial because Bell was the "most damaging" witness on Count 1. He further argues the omission of the evidence violated his Sixth Amendment right to confront witnesses, such federal constitutional issues were preserved, and if not, counsel was ineffective for failing to adequately preserve them.

## A. Factual Background.

At the outset of trial, appellant told the court he wanted to impeach Bell with evidence of Bell's conviction in 2000 for felony possession of marijuana, a 2005 conviction for felony second-degree burglary, and a 2001 conviction for receiving stolen property. Additionally, appellant wanted to introduce evidence that Bell lied to police on two separate occasions about the date of his birth. The first took place in February 2009 during a traffic stop on a misdemeanor warrant (driving with a suspended license) and the second took place in June 2009 during a traffic stop (driving without a license).

The prosecution objected that the evidence would be confusing and thus more prejudicial than probative. The court admitted the three (2000, 2001, and 2005) convictions, but excluded the two incidents of Bell's falsehoods about his age.

During opening statement, defense counsel observed that Bell was a liar and failed to identify appellant as the shooter until the police caught him lying. During trial, Bell admitted to lying for an entire year until the police caught him in his lies. He did not tell the truth until arrested as an accessory, and only after he feared his children would be taken away. Bell admitted the truth when confronted with a recorded telephone conversation where he made inculpatory statements.

24

## B.    Discussion.

### 1.    *Exclusion Under Evidence Code Section 352.*

Evidence Code section 352 gives the trial court discretion to exclude evidence "it deems irrelevant, cumulative, or unduly prejudicial or time-consuming." (*People v. Pride* (1992) 3 Cal.4th 195, 235.) To establish an abuse of discretion, a defendant must demonstrate that the trial court's decision was so erroneous that it falls outside the bounds of reason. A merely debatable ruling cannot be deemed an abuse of discretion; rather, an abuse of discretion will be established by a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Johnson* (2022) 12 Cal.5th 544, 605–606.)

*People v. Sapp* (2003) 31 Cal.4th 240 (*Sapp*), is instructive on the issue of impeachment evidence other than felony convictions. In *Sapp,* the prosecution called an expert in the penalty phase to rebut defense evidence that the defendant suffered from brain abnormalities and organic dysfunction at the time of the offenses. (*Id.* at pp. 287–289.) The defendant sought to impeach the expert's credibility by cross-examining him regarding charges of Medi-Cal fraud brought against him four years earlier and subsequently dismissed. (*Id.* at p. 289.) The trial court disallowed the cross-examination under Evidence Code section 352, concluding it involved a collateral matter that was more prejudicial than probative and would consume too much time and divert the jury from its primary purpose of deciding the appropriate penalty. (*Id.* at p. 289.)

In rejecting the defendant's claim that the court erred by disallowing the proposed cross-examination, *Sapp* explained that trial courts have broad discretion "'to prevent criminal trials from

degenerating into nitpicking wars of attrition over collateral credibility issues . . . .[¶] . . .[I]mpeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.'" (*Sapp, supra,* 31 Cal.4th at p. 289.)

Here, the trial court was within its discretion when it concluded additional evidence of Bell's falsehoods to police was of limited additional relevance and could confuse the jury. In any event, appellant cannot show prejudice where, as here, there was repeated testimony about Bell's predilection for prevarication. Bell admitted to his own untruthfulness concerning his knowledge of the shooting. Thus, it is not reasonably likely that had the additional evidence been admitted, appellant would have obtained a more favorable result at trial. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

### 2. *Federal Constitutional Issues.*

"'The federal Constitution's confrontation right is not absolute; it leaves room for trial courts to impose reasonable limits on a defense counsel's cross-examination of a witness.'" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [106 S.Ct. 1431, 89 L.Ed.2d 674]; *People v. Pearson* (2013) 56 Cal.4th 393, 454.) Here, the trial court's reasonable application of the rules of evidence to exclude evidence inadmissible under Evidence Code section 352 did not deprive appellant of his constitutional rights. (*People v. Turner* (2020) 10 Cal.5th 786, 818.) Where counsel's performance was not deficient, there can be no ineffective

assistance claim. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

## IV.   ADMISSION OF FACEBOOK POSTS.

Appellant made numerous Facebook posts with the username "Tiny Ug Fly." The posts referenced the shootings by using slang expressions employing rhythm, meter, and figurative speech. Appellant contends these posts were erroneously admitted at trial.

### A.   Retroactivity of Evidence Code Section 352.2

Appellant contends his convictions must be reversed and the matter remanded for a new trial so the trial court can apply newly enacted Evidence Code section 352.2 (Section 352.2), effective January 1, 2023, to determine whether to admit the Facebook posts. Although there is a split of authority on whether Section 352.2 is retroactive, we need not decide the issue because appellant suffered no prejudice from the absence of its application.

#### 1.   *Evidence Code Section 352.2*

Last year, Assembly Bill No. 2799 (Stats. 2022, ch. 973, § 2) added section 352.2 to the Evidence Code. Section 352.2 is designed to address problems with racial bias and stereotypes through the admission of rap videos. The Legislature found "[e]xisting precedent allows artists' creative expression to be admitted as evidence in criminal proceedings without a sufficiently robust inquiry into whether such evidence introduces bias or prejudice into the proceedings." (Stats. 2022, ch. 973, § 1, subd. (a).) Section 352.2 "provide[s] a framework by which courts can ensure that the use of an accused person's creative

27

expression will not be used to introduce stereotypes or activate bias." (*Id.* at § 1, subd. (b).)

Section 352.2, subdivision (a) provides, "In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evidence Code] Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings."

### 2. *Split of Authority on Retroactive Application.*

"[W]hen there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively." (*In re Estrada* (1965) 63 Cal.2d 740, 746 (*Estrada*).) In evaluating retroactive application, "[c]ourts look to the Legislature's intent in order to determine if a law is meant to apply retroactively." (*People v. Frahs* (2020) 9 Cal.5th 618, 627 (*Frahs*).) When *Estrada*'s retroactivity principle is applicable, it covers "all cases that are not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 675.)

Here, neither the text of Section 352.2 itself, nor the Legislature's findings and declarations, give any express indication that the Legislature intended Section 352.2 to apply retroactively to nonfinal cases. However, the general rule that new statutes operate prospectively will not apply where a criminal statute provides an ameliorative effect. In *People v. Venable* (2023) 88 Cal.App.5th 445 (*Venable*), the court held Section 352.2 applied retroactively. There, the defendant was driving a vehicle from which the passenger shot a rival gang member. (*Id.* at p. 452.) During trial, the prosecution introduced evidence of a "rap video" on YouTube that featured the defendant flashing gang signs while displaying guns, drugs, and money. The rap lyrics referred to the shooting and contained racial slurs. (*Id.* at pp. 452–453.)

*Venable* found admission of the rap video without consideration of Section 352.2's safeguards was prejudicial and reversed for a new trial. (*Venable, supra,* 88 Cal.App.5th at p. 458.) *Venable* principally relied on two cases: (1) *Frahs, supra,* 9 Cal.App.5th at pp. 627–628, in which a new provision granting diversion for mental health disorder was deemed ameliorative and thus retroactive because it carried the potential for a reduction in punishment (*Id.* at p. 631), and (2) *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299 (*Lara*), in which the court considered the retroactivity of Proposition 57, which prohibited prosecutors from directly charging minors as adults and gave discretion to the juvenile court to determine the issue. (*Id.* at p. 308.) *Lara,* like *Frahs,* found the new provisions ameliorative because the new provisions could possibly reduce punishment, as the defendant would be treated like a juvenile and receive different and more lenient treatment. (*Id.* at p. 303.)

29

Finding the possibility of reduced punishment sufficient for retroactive application, *Venable* held Section 352.2 retroactive. However, taking a different view is *People v. Ramos* (2023) 90 Cal.App.5th 578. There, the court emphasized that retroactivity under the *Estrada* rule applied where newly enacted legislation lessened punishment or reduced criminal liability. (*Id.* at p. 594.) Finding that Section 352.2—while it may be beneficial to a criminal defendant—did not reduce punishment or criminal liability, *Ramos* distinguished *Frahs* and *Lara* on the basis those cases examined statutory enactments resulting in potentially more lenient punishments, "which is not the effect of Evidence Code section 352.2." (*Id.* at pp. 595–596.) *Ramos* concluded "[c]urrent precedent from our Supreme Court does not support an extension of the *Estrada* rule to a statutory change that may possibly benefit a criminal defendant but that does not redefine the conduct subject to criminal sanctions or, at least potentially, reduce or eliminate the applicable punishment." (*Id.* at p. 596.)

3.     *We Need Not Decide if Section 352.2 Applies Retroactively Because it is Not Reasonably Probable the Result Would Have Been Different.*

Here, we need not decide whether Section 352.2 is retroactive because any error in the admission of appellant's Facebook evidence was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Where, as here, the evidence of guilt on the relevant charges is "overwhelming," it is unlikely appellant was harmed by the format of the trial. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 931 [concluding the failure to bifurcate was harmless under the *Watson* standard because "[t]here was overwhelming evidence of defendant's guilt"].) As discussed above, there was abundant evidence of guilt based on substantial

eyewitness evidence and surveillance evidence linking appellant to both shootings. Thus, even if consideration of the factors in Section 352.2 led to the exclusion of appellant's Facebook posts, it is not reasonably likely the jury would have reached a different verdict.

## B. Warrant for Appellant's Facebook Records

Appellant contends the trial erred in failing to quash the warrant for his Facebook records on the basis it lacked probable cause. Specifically, he asserts the warrant relied on untested information from informants lacking sufficient corroboration, and that the good faith exception did not apply. We disagree.

### 1. *Factual Background.*

In August 2015, the Sheriff's Department sought a warrant for appellant's Facebook posts. The warrant's statement of probable cause recited that Deputy Peter Tovar, the deputy seeking the warrant, was aware of a recent increase in gang violence in the "Vermont Corridor," an area of Los Angeles bordered by Van Ness Avenue on the west, Vermont Avenue on the east, El Segundo Boulevard on the south, and Manchester Avenue on the north. Investigators had confirmed the acts of violence in and around the Vermont Corridor were the result of an ongoing gang war between members of the Hoovers, Eight Trey Gangster Crips, and the Rolling 100s.

The warrant's affidavit detailed a surveillance video of the Monarch Liquor Store at the time of the shooting. In the video, a 2013 Dodge Dart is parked adjacent to the Monarch Liquor Store on 88th Street. The victim (Washington) got out of the Dart and walked across the street. Two vehicles, a Saturn belonging to Furdge and a Monte Carlo belonging to Randle, approached

31

Vermont Avenue going eastbound on 88th Street and appear to stop at a traffic light. Washington crossed the street towards the two vehicles when a passenger from the Saturn got out of the car holding a black and silver automatic handgun. The passenger ran towards Washington, fired multiple rounds at him, and fired at the occupants in the Dodge Dart. The passenger got back into the Saturn and drove off. The shooter was wearing wire framed glasses.

The warrant also detailed statements by victim Carr, who stated the shooter wore oval silver-framed glass, and the Vermont Line bus driver, who stated the shooter's glasses were gold-framed. The bus driver described the shooter as 17-25 years old, about 5 foot 6 to 5 foot 7.

Investigators spoke to informants who told them they had heard the shooter was an individual in the Underground Crips known as "Tiny Fly" or "Fly." Investigators knew appellant as "Tiny Fly," and appellant resembled the shooter in the surveillance video, having the same body type, shape of face, skin tone, and type of glasses. Appellant's Facebook username contained "Ug," which meant "Underground Crips." Deputy Tovar believed the Facebook pages would provide evidence of appellant's involvement in Washington's murder.

Appellant made an oral motion to quash the warrant, asserting it relied on anonymous sources. The trial court denied the motion, finding, "there is more to this affidavit than just a person giving anonymous information. There is a video which shows a person resembling the defendant wearing gold rimmed glasses. That, together with the information received[,] is sufficient for the search warrant. . . . I [also] would find there is a good faith exception to the search warrant rule."

### 2. *Discussion.*

### (a) Probable Cause Supported the Affidavit.

Evidence obtained in violation of the Fourth Amendment is inadmissible. (*Mapp v. Ohio* (1961) 367 U.S. 643, 650 [81 S.Ct. 1684, 6 L.Ed.2d 1081].) A defendant may move to suppress evidence on the ground that a search or seizure with a warrant was unreasonable. (§ 1538.5, subd. (a)(1)(B)(i)–(v).) "'In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards.'" (*People v. Macabeo* (2016) 1 Cal.5th 1206, 1212.)

The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. "'The test for probable cause is not reducible to "precise definition or quantification."' [Citation.] But . . . it is 'less than a preponderance of the evidence or even a prima facie case.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 659–660.) The issuing magistrate must make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before the court, there is a fair probability that contraband or evidence of a crime will be found in a particular place. The magistrate's determination of probable cause is entitled to deferential review, and the warrant will be overturned only if the affidavit fails as a matter of law to set forth sufficient competent evidence supporting the finding of probable cause. (*Ibid.*) "'Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause,

33

the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" (*People v. Weiss* (1999) 20 Cal.4th 1073, 1082–1083.)

The California Supreme Court "'ha[s] distinguished between those informants who "are often criminally disposed or implicated, and supply their 'tips' . . . in secret, and for pecuniary or other personal gain" and victims or chance witnesses of crime who "volunteer their information fortuitously, openly, and through motives of good citizenship."'" (*People v. Scott* (2011) 52 Cal.4th 452, 475, quoting *People v. Ramey* (1976) 16 Cal.3d 263, 268–269 (*Ramey*).) There is no requirement that information provided by a citizen informant be corroborated for it to constitute probable cause supporting the issuance of a warrant. (*People v. Smith* (1976) 17 Cal.3d 845, 852 ["an untested citizen-informant who has personally observed the commission of a crime is presumptively reliable"].)

Corroboration includes any facts, sources, and circumstances which reasonably tend to provide independent support for an informant. (*People v. Gotfried* (2003) 107 Cal.App.4th 254, 263–264.) In a police investigation the information given by informants, even where the informant's reliability is not complete, can nevertheless be sufficient to establish the requisite probable cause if it is corroborated in essential respects by other facts, sources, or circumstances. (*People v. Fein* (1971) 4 Cal.3d 747, 753.) The purpose served by corroboration in this situation is "to establish that the information provided by the informant did not constitute a made-up story, one fabricated out of whole cloth. Corroboration of part of the information provided by the informant [gives] credibility to the remainder of the information." (*People v. Medina* (1985) 165

34

Cal.App.3d 11, 20.) It is sufficient if an informant's statements are corroborated in a number of key respects, and a piecemeal approach is not required. (*Ibid.*)

For corroboration to be adequate, it must pertain to the alleged criminal activity, and it is sufficient if police investigation has uncovered probative indications of criminal activity along the lines suggested by the informant. (*People v. Gotfried, supra,* 107 Cal.App.4th at pp. 263–264; *People v. Kershaw* (1983) 147 Cal.App.3d 750, 758–759.) "It is only where . . . neither the veracity nor basis of knowledge of the informant is directly established, or the information is not so detailed as to be self-verifying, or there is no logistical or other reason verification from other sources cannot be achieved, that the failure to corroborate may be indicative that it was objectively unreasonable for the officer to believe in the existence of probable cause." (*People v. Maestas* (1988) 204 Cal.App.3d 1208, 1220–1221, fn. omitted.) Ultimately, the information in a search warrant affidavit which has been supplied by an informant and corroborated by investigation conducted by law enforcement need only give the officers reasonable grounds to believe that the informant is truthful. (*People v. Lara* (1967) 67 Cal.2d 365, 374–375.)

Here, appellant asserts the affidavit stated informants had heard Tiny Fly was the shooter. He complains these tipsters had no personal knowledge of the shooting, and the identity of these informants was unknown; thus, this information was insufficient to support a probable cause finding. Further, the description of appellant (light skinned black male about 17-25 years of age and wearing wire framed glasses) was far too general to provide probable cause; Carr's description differed from the Vermont line

bus driver's description (silver versus gold-framed glasses); and similarity in body type and skin color was too vague to constitute probable cause.

We disagree. Here, there was a network of facts tying appellant to the offenses. The surveillance video's images of appellant, coupled with the detailed eyewitness descriptions of Carr and the bus driver that tracked the video, placed him at the Monarch Liquor Store scene. This information, combined with the information that appellant went by "Tiny Fly," and was an Underground Crip, provided a sufficient basis for a warrant seeking appellant's Facebook posts.

### (b)    The Good Faith Exception Applied.

"[W]hen . . . the police do obtain a warrant, that warrant is presumed valid." (*People v. Amador* (2000) 24 Cal.4th 387, 393.) "Because a search conducted pursuant to a search warrant is presumed lawful, the burden of establishing the invalidity of the search warrant rests upon the defendant." (*People v. Lazalde* (2004) 120 Cal.App.4th 858, 865.)

Under the good faith exception to the exclusionary rule, "[e]vidence obtained by police officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate is ordinarily not excluded under the Fourth Amendment, even if a reviewing court ultimately determines the warrant is not supported by probable cause." (*People v. French* (2011) 201 Cal.App.4th 1307, 1323.) However, the good faith exception will not apply if the affidavit is so lacking in indicia of probable cause that the officer's reliance on the warrant is objectively unreasonable. (*Ibid.*)

Indeed, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause

determination or his [or her] judgment that the form of the warrant is technically sufficient." (*United States v. Leon* (1984) 468 U.S. 897, 921 [104 S.Ct. 3405, 82 L.Ed.2d 677] (*Leon*).) *Leon* observed that marginal or nonexistent benefits produced by suppressing the evidence obtained did not justify the substantial costs of exclusion because the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. (*Ibid.*) In considering the issue, we apply the objective test of ""'whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization."' (*Leon, supra,* 468 U.S. at p. 922, fn. 23.) We review the trial court's application of the good faith exception de novo." (*People v. Lazarus* (2015) 238 Cal.App.4th 734, 766–767.)

Here, even assuming that the warrant was not supported by probable cause, appellant has not shown that a "reasonably well-trained officer would have concluded the information in the affidavits was fatally unreliable as being so lacking in indicia of reliability, or that the magistrate issuing the warrant was misled by any information." (*Leon*, *supra*, 468 U.S. at p. 922, fn. 23.) On the contrary, the information in the affidavit was logically connected, with each fact confirming the others. The statements from Carr and the bus driver matched appellant's description, and the surveillance video depicted the shooting in detail.

### C. Admission of Appellant's Facebook Posts Under the Business Records Exception to the Hearsay Rule.

Appellant contends the trial court erroneously admitted his Facebook photographs and posts based upon stipulated testimony that was insufficient to establish the business records exception to the hearsay rule applied. He contends the error deprived him

of due process, the error was prejudicial, and if any federal error was forfeited, counsel was ineffective. Respondent counters that appellant forfeited the issue by failing to adequately object in the trial court and invited error by entering into the stipulation concerning the records.

### 1. Procedural Background.

During pretrial proceedings, the prosecution moved to introduce the Facebook records obtained pursuant to the warrant under the business records exception to the hearsay rule.[8] The records included photographs of appellant in gold-rimmed glasses, posting of gang photographs, posts in which appellant pledged his loyalty to the Underground Crips, posts alluding to revenge, and posts referring to the Hoovers by derogatory names. The prosecution asserted the evidence was probative on the issues of identity, motive, and intent.

At trial, the prosecution wanted to call Detective Timmerman to lay a foundation for the Facebook records unless the parties were able to reach a stipulation concerning their admission. Accordingly, the court asked appellant's counsel if he would stipulate that "Detective Thorston Timmerman received

---

8    Evidence Code section 1271 provides, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

38

appellant's Facebook records, and that Detective Timmerman would have testified, if duly sworn, that these records were produced in the regular course of business; that these records were generated at or near the time of the events; and that he is familiar with the process by which Facebook maintained and generates and produces these Facebook records?" Counsel responded, "Yes, I stipulate that would have been his testimony." Counsel did not object to the admission of the Facebook posts on hearsay grounds.

### 2. Discussion.

Appellant argues the stipulated testimony was insufficient to establish the business records exception applied because Detective Timmerman did not testify about the mode of preparation. Specifically, appellant contends that although Detective Timmerman was familiar with how such records were maintained, generated, and produced, he did not testify that the records conformed to those procedures and there was no information that he had personal knowledge of any of these facts. Further, there was no affidavit accompanying the return on the search warrant pursuant to Evidence Code section 1561.

We need not decide the issue, because even if it were error to admit the evidence, appellant invited such error. (*People v. Harrison* (2005) 35 Cal.4th 208, 237.) "'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal.'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.)

Any objection to the admission of evidence must be particularly stated. (Evid. Code, § 353; *Kiler v. Kimbal* (1858) 10

39

Cal. 267, 267.) "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353.) "In accordance with this statute, we have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." (*People v. Seijas* (2005) 36 Cal.4th 291, 302.)

This objection requirement is necessary in criminal cases because a "contrary rule would deprive the People of the opportunity to cure the defect at trial and would 'permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal.'" (*People v. Rogers* (1978) 21 Cal.3d 542, 548.) "[The rule] allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal." (*People v. Morris* (1991) 53 Cal.3d 152, 187–188.)

Here, appellant invited any error and the issue is not cognizable on appeal due to appellant's failure to object to the evidence. Appellant was aware the prosecution, absent a stipulation from the defense, needed to call a witness to lay a foundation for the Facebook records. After entering into the stipulation, appellant did not object to the records. This lack of objection deprived the prosecution of an opportunity to cure any

defect in meeting the requirements of the business records exception to the hearsay rule, or in laying an appropriate foundation.

Finally, we reject appellant's contention that his counsel rendered ineffective assistance due to counsel's failure to object on federal constitutional grounds and argue that admission of the Facebook posts would violate his due process rights and render the trial unfair.

The right to effective assistance of counsel derives from the Sixth Amendment right to assistance of counsel. (*Strickland v. Washington, supra,* 466 U.S. at pp. 686–694; see also Cal. Const., art. I, § 15.) To demonstrate ineffective assistance, appellant must show (1) "counsel's [conduct] was deficient when measured against the standard of a reasonably competent attorney," and (2) prejudice resulting from counsel's performance "'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" (*People v. Mayfield* (1997) 14 Cal.4th 668, 784.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland v. Washington, supra*, at p. 697.)

"'[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable.'" (*Babbitt v. Calderon* (9th Cir. 1998) 151 F.3d 1170, 1173.) Prejudice is shown where there is a reasonable probability, but for counsel's errors, that the result of the proceeding would have been different. (*In re Harris* (1993) 5 Cal.4th 813, 833.) Further, prejudice must be established as "'"a demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.'" (*In re Clark*

(1993) 5 Cal.4th 750, 766.) Our review of counsel's performance is deferential, and strategic choices made after a thorough investigation of the law and facts are "virtually unchallengeable." (*In re Cudjo* (1999) 20 Cal.4th 673, 692.)

Here, appellant cannot show that such an objection would have been sustained, given the stipulation he previously entered regarding admission of the Facebook posts. Thus, where, as here, counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

### D.    Admission of Prison Photographs

Appellant contends the trial court abused its discretion in admitting Facebook photographs that depict him in prison; further, counsel was ineffective for failing to object on appropriate grounds and the error deprived him of due process.

#### 1.    *Factual Background.*

Appellant objected on Evidence Code section 352 grounds to the Facebook records showing him in a prison cell. The photos (Facebook pages 324, 388, and 472) at issue depict appellant in various poses, displaying his tattoos and wearing his glasses. The court admitted the photographs, finding them relevant to showing appellant with gang tattoos and wearing his glasses.

#### 2.    *Discussion.*

We review the trial court's decision to admit the photographs for abuse of discretion. (*People v. Scully* (2021) 11 Cal.5th 542, 590.) "'To determine whether there was an abuse of

discretion, we address two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect.'" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1282.)

Under Evidence Code section 352, the evidence was highly probative to establish appellant was the shooter the witnesses had described, as well as establish his motivation as a gang member to commit violent acts for the Underground Crips. He is wearing glasses, displaying his gang tattoos, or holding up what appears to be a shirt with the letter "U."

Moreover, the photographs were not unduly prejudicial such that exclusion was required under Evidence Code section 352. There was no danger of confusing the issues, or of misleading the jury. (See *People v Chhoun* (2021) 11 Cal.5th 1, 26.) The prejudice that Evidence Code section 352 is designed to avoid "'is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.'" (*People v. Baker* (2021) 10 Cal.5th 1044, 1089.) Rather, it generally refers to evidence "that prompts an emotional reaction against the defendant and tends to cause the trier of fact to decide the case on an improper basis." (*People v. Walker* (2006) 139 Cal.App.4th 782, 806.)

Here, the photographs would not invoke undue prejudice. Appellant appears in several poses facing the camera and in one picture displays his gang tattoos. It is not necessarily apparent that he is in prison; he is not displaying weapons or throwing gang signs. Thus, there is nothing about these photographs that would prompt an emotional reaction or cause the jury to decide the case on an improper basis, namely, to convict defendant

43

simply because he was gang member. Because there is no statutory error, appellant's constitutional claim fails. (*People v. Fuiava* (2012) 53 Cal.4th 622, 670.)

For these reasons, as appellant cannot demonstrate improper admission of the photographs, his ineffective assistance claims fail.

### E.    Ineffective Assistance of Counsel: Admission of Facebook Pages.

Appellant contends counsel was ineffective for failing to object, until the gang expert had testified at length, to the Facebook records on foundational and hearsay grounds.

#### 1.    *Factual Background.*

Deputy Castaneda testified at trial that he reviewed portions of appellant's Facebook postings. He opined that "HK" referred to "Hoover Killer." Also, he continued, if a post said "strapped," that meant carrying a weapon, and "CC" meant Crips, because "CK" meant "Crip Killer." He further explained that Crips, including Underground Crips, would not put a "K" after a "C" because they would not want to refer to themselves as a "Crip Killer." Therefore, they replace a "K" with a "C." Where appellant posted "Snoova Remover," appellant claimed he was someone who got rid of Hoovers.

One post stated, "[T]he countdown has officially begun. The lift off is coming soon. Real soon." The word "the" had a "K" after the "H." Underground Crips often refer to themselves as "Hoover killers," so after every "H" there was a "K," which meant "Hoover Killer." Another post said, "the time has come for the underground king to reclaim my spot. Heard it's a few of my own that feel otherwise, so I say to you . . . 'let's play ball, because it

44

will be you.' I'm coming at first forever grounded darula, [sic] Tiny Fly." Another post stated, "I'm strapped up . . . fucc a gun law . . . . See me walking with a limp. That's my gun walk." Deputy Castaneda explained, as noted above, that "strapped" meant carrying a firearm. The spelling of the expletive as "fucc" was because Underground Crips never put a "K" after a "C" because that meant "Crip Killers."

Further posts said, "I was a regular with DA burner on my hip in case a Snoova felt lucky. But I forgot they were scared to hit Normandie back then. Now they regulars. LOL." A "burner" is a street term for a firearm. Another post also stated, "Bitch, stop playing U. It like U-G's U, (snoova, tramp, and slobs)." Castaneda interpreted this as a threat toward rivals, because "tramp" is derogatory toward Eight Trey Gangsta Crips and "slobs" is derogatory toward Bloods.

### 2. Discussion.

Appellant contends trial counsel did not object to this gang testimony on hearsay or foundational grounds, thereby depriving him of effective assistance of counsel. He points out that gang experts are not allowed to relate case-specific hearsay to the jury. (See, e.g., *People v. Sanchez* (2016) 63 Cal.4th 665, 676–679 (*Sanchez*).) Furthermore, he contends that although a party's admissions are generally admissible under Evidence Code section 1220, the statements here did not qualify as appellant's admissions because the Facebook posts in which they were contained did not meet the foundational requirements of the business records exception. Finally, he asserts counsel had no tactical reason for failing to object because counsel had previously objected to the evidence.

45

Although appellant is correct there is a foundational requirement for the Facebook admissions to show it was appellant who made the statements, appellant invited any error by failing to object to the application of the business records exception before the gang expert began his testimony. As a result, counsel cannot be deemed ineffective for failing to raise the argument again, as any objection would have been pointless. Defense counsel cannot be considered ineffective for failing to make futile objections. (*People v. Boyette* (2002) 29 Cal.4th 381, 437.)

The Facebook statements are admissible as party admissions regardless of whether the statements qualified as business records. Under Evidence Code section 1220, "[e]vidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party. . . ." (*People v. Rodriguez* (2014) 58 Cal.4th 587, 637.) Finally, appellant's objection under *Sanchez, supra,* 63 Cal.4th 665, is thus not well taken. *Sanchez* observed that while an expert cannot relate as true case-specific facts asserted in hearsay statements, such statements can be independently admissible if proven by competent evidence or covered by a hearsay exception. (*Id.* at p. 687.) The Facebook posts here qualified as party admissions.

Finally, because the Facebook posts properly came in under several exceptions to the hearsay rule, any further objection to their contents would have been futile. Thus, counsel's performance was not deficient, and there can be no ineffective assistance claim. (*Strickland v. Washington, supra,* 466 U.S. at p. 694.)

## V.     IN-COURT IDENTIFICATION OF APPELLANT.

Appellant contends defense counsel improperly elicited in court from witness Derrick Jones testimony that he recognized appellant as Ross, Jr.'s shooter, and that this error deprived him of effective assistance of counsel.

### A.     Factual Background.

Jones, who witnessed the shooting at the AutoZone store, testified on direct examination for the prosecution that he was inside the store and saw Ross, Jr. in line. After Ross, Jr. left the store, Jones heard shots fired. Jones looked out the window, and saw a person with a handgun. The man was bald, wore glasses, looked to be about 41 or 42 years old, and was African American. Later, police showed Jones a photo array, but Jones was not able to identify appellant.

On cross-examination, Jones reiterated that he did not recognize appellant when shown a photo array. Defense counsel asked, "You don't recognize [appellant] as the shooter, correct?" Jones responded, "I do recognize him as the shooter at the time of the incident when it occurred." Counsel asked, "You recognize him now?" Jones responded, "Yes I do." Jones testified that he did not know appellant and had never seen him before. However, Jones got a good look at the shooter the day of the incident.

Although Jones had not seen appellant since the day of the shooting, he recognized him in court. Jones did not recognize appellant in the photo array because appellant's picture was not in the array. Counsel inquired, "you do agree that your memory seven months after the [shooting] was better . . . than it is now five years later?" Jones responded, "No, I say he's still the same."

On redirect, Jones reiterated that he got a 30-second look at the shooter. Jones realized appellant was the shooter when he stepped on the stand to testify.

**B.    Discussion.**

In evaluating a claim of ineffective assistance, we indulge a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. (*People v. Gamache* (2010) 48 Cal.4th 347, 391.)

Where, as here, counsel inadvertently elicits damaging testimony, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Strickland v. Washington*, *supra,* 466 U.S. at p. 689.)

Thus, even where defense counsel has elicited damaging testimony, we will not second guess counsel's tactical choice of questions that led to such testimony. (*People v. Williams* (1997) 16 Cal.4th 153, 217.) Here, counsel made a plausible tactical decision to attempt to establish that Jones could not identify appellant. Jones had testified on direct that he did not and could not identify appellant, and defense counsel sought to underscore that testimony. There was no reason for defense counsel to expect this testimony to suddenly change. (Cf. *In re Jones* (1996) 13 Cal.4th 552, 570–571 (*Jones*).) In *Jones,* defense counsel elicited

damaging testimony on cross-examination that the defendant was the killer. However, unlike here, in *Jones,* defense counsel had no reason to believe this testimony was not forthcoming. (*Ibid.*)

## VI. ADMISSION OF EVIDENCE APPELLANT COMMITTED A HOME INVASION ROBBERY.

Appellant contends the trial court erroneously admitted evidence he committed a home invasion robbery with witness Johnson shortly after the Ross, Jr. shooting. Appellant asserts this evidence was inadmissible under Evidence Code section 786 as an improper attack on a witness's credibility, improper character evidence under Evidence Code section 1101, and his counsel was ineffective for failing to object on all appropriate grounds. Respondent asserts appellant forfeited the claim and has failed to show that counsel did not have a reasonable tactical basis for objecting on this ground after the trial court had already overruled an objection under Evidence Code section 352.

### A. Factual Background.

Before Johnson, a defense witness who would testify appellant was not the shooter, testified, the prosecution sought to admit evidence that after participating in the AutoZone shooting, Johnson and appellant committed a home invasion robbery for which they were both convicted. Defense counsel objected that this evidence was inadmissible because it had no bearing on the charges in this case and would be more prejudicial than probative under Evidence Code section 352.

The trial court admitted the evidence, finding the evidence probative of Johnson's bias and credibility because appellant and

49

Johnson were connected by both their joint gang membership and the commission of a crime together.

On direct examination as a defense witness, Johnson testified that appellant was not the man he saw getting into the Buick after the shooting at the AutoZone. On cross-examination, the prosecution asked if Johnson had committed another crime with appellant in September 2015. Johnson admitted he had participated in a home invasion robbery with appellant, and had been convicted of the offense. Johnson claimed, however, that appellant was innocent in that case, and Johnson denied being in the vehicle on the way to the robbery.

### B.    Discussion.

Here, the evidence was relevant to prove Johnson's allegiance to appellant as a fellow gang member and partner in crime, and thus damage Johnson's credibility. As such, the testimony was highly probative. Further, it was not unduly prejudicial. The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. (*People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 408.) Johnson's prior act evidence was directed at his credibility and did not involve weapons, gang activity, a shooting, or anything else likely to invoke undue prejudice.

Although appellant did not raise objections under Evidence Code sections 786 and 1101 at trial, thereby forfeiting those objections under Evidence Code section 353, subdivision (a), we address them nonetheless to dispose of his ineffective assistance claims.

First, sections 786 through 790 govern the admissibility of character trait evidence to attack or support the credibility of a witness. (*People v. Thompson* (1979) 98 Cal.App.3d 467, 475.) In general, a party may cross-examine a witness about the witness's motive and bias. (Evid. Code, § 780, subd. (f).) "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness['s] story to test the witness['s] perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness," including by "cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 316 [94 S.Ct. 1105, 39 L.Ed.2d 347].) "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" (*Ibid*.)

Evidence Code section 789, which appellant cites on appeal, generally limits witness character-credibility evidence to honesty and veracity and their opposites because those are the only four traits relevant to that issue. (*People v. Knox* (1979) 95 Cal.App.3d 420, 434.) Where, however, a specific instance of conduct is relevant to prove a witness's bias or improper motive, apart from any relevancy it has to prove a character trait, it is admissible. "[E]vidence contradicting the testimony of a witness, even if it consists of proof of other wrongful acts, is proper if it is relevant to an issue in the case." (*Id.* at p. 434.) Here, Johnson's prior act in assisting appellant in committing a crime was relevant to his

51

bias on the stand and motive to defend appellant by repudiating his earlier identification of appellant as the shooter.

Evidence Code section 1101, subdivision (a), which prohibits character evidence in general, permits such evidence where relevant to establish "motive, opportunity, intent, preparation, [or] plan." (Evid. Code, § 1101, subd. (b).)

For these reasons, we conclude that admission of the evidence did not unduly prejudice appellant. As a result, no ineffective assistance of counsel claim lies. (*Strickland v. Washington, supra,* 466 U.S. at p. 697.) Further, counsel may have had a tactical basis for declining to make further objections, given that the trial court admitted the evidence under Evidence Code section 352. (See *People v. Gamache, supra,* 48 Cal.4th at p. 391.)

## VII.  PROSECUTORIAL MISCONDUCT.

Appellant contends the prosecution argued facts not in evidence when it improperly vouched for the key witness Bell, and such misconduct was prejudicial because Bell's testimony was essential to appellant's identification as the shooter at the Monarch Liquor Store. Appellant further contends counsel was ineffective for failing to object to this evidence. Respondent counters that this claim was forfeited due to defense counsel's failure to object, but even assuming the comments were improper, they were not prejudicial.

### A.    Factual Background.

During closing argument, the prosecution told the jury "[i]t was decided that there was not enough evidence to convict Patrick Bell." The trial court instructed the jury that it was not to speculate why Bell was not being prosecuted or whether he would

be prosecuted in the future, and admonished the jury that it must determine whether Bell was an accomplice. The court also instructed the jury that arguments of counsel were not evidence.

## B. Discussion.

A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process or involves deceptive or reprehensible methods employed to persuade the trier of fact. (*People v. Silveria & Travis* (2020) 10 Cal.5th 195, 306.) When attacking the prosecution's remarks to the jury, the defendant must show that in the context of the whole argument and the instructions there was a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. (*Ibid.*) "'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.'" (*Ibid; People v. Powell* (2018) 6 Cal.5th 136, 171.)

Although appellant forfeited his argument by failing to object to the prosecutor's statements, we find no prejudice from the prosecution's isolated comment. The comment itself was brief; although Bell was a primary witness to the shootings, there was also extensive other evidence of appellant's involvement in the Monarch Liquor Store shooting (eyewitness testimony, including Carr and the bus driver) as well as Bell's tendency to lie. Further, the trial court specifically admonished the jury regarding this comment and that arguments of counsel were not evidence. Thus, it is not reasonably probable that absent the prosecutor's comments, the result at trial would have been different.

For these reasons, we find no ineffective assistance claim. We need not determine whether counsel was deficient for failing to object, because without any prejudice from counsel's failure, there can be no ineffective assistance. (*Strickland v. Washington, supra,* 466 U.S. at p. 697; see also *In re Crew* (2011) 52 Cal.4th 126, 150 ["If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient"].)

## VIII. CUMULATIVE ERROR.

Appellant argues the combined errors deprived him of a fair trial. He asserts the jury heard several inadmissible and inflammatory messages from his Facebook page and he was unable to fully confront Bell, a key prosecution witness; his *Marsden* motion was denied even though his counsel left at least one biased juror on the case; his counsel failed to object to prosecutorial vouching; and his counsel failed to properly argue evidentiary rulings. Appellant's argument lacks merit because we have rejected each of appellant's individual claims. Thus, they "cannot logically be used to support a cumulative error claim [where] we have already found there was no error to cumulate." (*In re Reno* (2012) 55 Cal.4th 428, 483.)

## IX. GANG ENHANCEMENTS, ASSEM. BILL NO. 333.

Appellant argues the gang enhancements and gang special circumstances must be reversed because the jury was not instructed with the new requirements of section 186.22, as amended effective January 1, 2022. While conceding that Assem. Bill No. 333 applies retroactively to the gang enhancements, respondent asserts that those amendments do not apply to the

gang-murder special circumstance findings (§ 190.2, subd. (a)(22)). We disagree.

## A. Factual Background.

During trial, counsel stipulated that the Underground Crips was a criminal street gang as defined in sections 186.22 and 190.2, subdivision (a)(22). The parties also stipulated to predicate acts. However, because trial predated the effective date of Assem. Bill No. 333, the jury was not instructed with the changes in the law applicable to the gang enhancements or the special circumstance allegation.

The jury found true the section 12022.53, subdivision (b)-(e)(1) enhancements, which require a true finding on the underlying gang enhancement. Finally, the jury found true the gang special circumstance alleged regarding each murder.

## B. Analysis.

*1. Assem. Bill No. 333 Modified Section 186.22 to Require Additional Proof, Requiring Remand.*

In 2021, the Legislature enacted Assem. Bill No. 333, which amended section 186.22 to impose new substantive and procedural requirements for gang allegations. (Assem. Bill No. 333 (Reg. Sess.) § 3.) Assem. Bill No. 333 found "[g]ang enhancement evidence can be unreliable and prejudicial to a jury" because such evidence "is lumped into evidence of the underlying charges[,] further perpetuat[ing] . . . convictions of innocent people." (Stats. 2921, ch. 699, § 2(d)(6)); see *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129.) Therefore, Assem. Bill No. 333 modified the evidentiary standard for admission of gang evidence and provided for bifurcation of trials to separate the

55

gang evidence from the underlying charges. The statute is silent about retroactivity. (*People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822.)

The amendments to section 186.22 "require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343.) Among other things, Assem. Bill No. 333 amended the definitions of "criminal street gang" (§ 186.22, subd. (f)) and "pattern of criminal gang activity" (§ 186.22, subd. (e)(1)), and clarified the evidence needed to establish that an offense benefits, promotes, furthers, or assists a criminal street gang. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 477–478.)

Most notably, the new law defines "to benefit, promote, further, or assist" as "to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).) In addition, the new law imposes a stricter requirement for proof of a predicate offense, namely "a pattern of criminal gang activity," which is necessary to prove that the group with which the defendant is associated is indeed a criminal street gang. (See § 186.22, subd. (f).) The current offense cannot be used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) Finally, both predicate offenses must have been committed "within three years of the date the current offense is alleged to have been committed," by gang "members," and must have been for the "common[ ] benefit[ ] [of] a criminal street gang." (§ 186.22, subd. (e)(1).)

Thus, in summary, pursuant to the new legislation, imposition of a gang enhancement requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have "commonly benefited a criminal street gang" where the "common benefit[ ] . . . is more than reputational"; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members; and (4) the charged offense cannot be used as a predicate offense. (Assem. Bill No. 333 (Reg. Sess.) § 3, § 186.22, subd. (e)(1)–(2).)[9]

Respondent concedes and the parties do not dispute the new section 186.22 applies retroactively to cases not yet final on appeal. (*People v. Lopez*, *supra,* 73 Cal.App.5th at p. 344.) The same standards apply to challenges to the evidence underlying a true finding on a special circumstance as to any other evidence. (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

Here, we find the true findings on the gang enhancements and gang-related gun enhancements must be reversed and remanded for retrial because the jury was not instructed in accordance with the additional proof requirements of Assem. Bill No. 333, namely, that the benefit to the gang is more than

---

9    Assem. Bill No. 333 also added section 1109, which provides that, upon the defendant's request, the trial court must bifurcate an enhancement charged under section 186.22, subdivision (b), from the underlying charges. (§ 1109, subd. (a).) In addition, such separate proceedings must be held after the determination of the defendant's guilt in the underlying offenses. (§ 1109, subd. (a).) Appellant does not argue that this provision is retroactive or that it should apply to his case.

reputational, the last predicate offense occurred within three years of the date of the currently charged offense, and the predicate offenses must be committed on separate occasions or by two or more gang members. Respondent concedes this point.

>    2.    *Assem. Bill No. 333 Did Not Unconstitutionally Amend Proposition 21.*

Appellant contends the jury's true finding regarding the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)) must also be vacated under the law as amended by Assem. Bill No. 333. Respondent argues Assem. Bill No. 333's amendment of the gang-murder special circumstance is unconstitutional.

Section 190.2 sets forth a list of special circumstances in which the punishment for first degree murder is death or life without the possibility of parole. (§ 190.2, subd. (a).) Section 190.2, subdivision (a)(22), provides for a special circumstance where the "defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

Proposition 21, enacted by California voters in 2000, added this special gang circumstance to this list. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 11, pp. 121-122.) However, Assem. Bill No. 333 amended the definition of a "criminal street gang" in section 186.22, subdivision (f), by narrowing that definition. Authority is split on whether Assem. Bill No. 333 unconstitutionally amended section 190.2, subdivision (a)(22). We recently held in *People v. Lee* (2022) 81 Cal.App.5th 232 (*Lee*), review granted Oct. 19, 2022, S275449, that Assem. Bill No. 333's amendments are constitutional.

However, *People v. Rojas* (2022) 80 Cal.App.5th 542 (*Rojas*), review granted Oct. 19, 2022, S275835, reached the opposite result.

In *Rojas*, a divided panel in the Fifth Appellate District held that Assem. Bill No. 333 is unconstitutional to the extent it narrowed the scope of conduct made punishable under section 190.2, subdivision (a)(22). (*Rojas, supra*, 80 Cal.App.5th at p. 555.) The *Rojas* majority concluded that the legislative amendment was unconstitutional as applied because California voters had restricted the Legislature's ability to amend the provisions of Proposition 21 by stating it could only do so with a two-thirds vote in each house or by a statute that becomes effective only when approved by the voters. *(Id.* at p. 553; Voter Information Guide, Primary Elec., supra, text of Prop. 21, § 39, p. 131.) Because Assem, Bill No. 333 did not comply with that requirement, and effectively narrowed the scope of section 190.2, subdivision (a)(22), the *Rojas* majority held the amendment unconstitutional as applied. (*Rojas*, *supra*, at pp. 557–558.)

In *Lee*, we reached the opposite result and rejected the argument that Assem. Bill No. 333 impermissibly narrowed the scope of section 190.2, subdivision (a)(22), by amending the definition of a "criminal street gang" in section 186.22. (*Lee, supra*, 81 Cal.App.5th at p. 241.) Focusing on the voter's intent as expressed in the language of Proposition 21, we found no indication that voters intended to prohibit any future amendment of section 186.22, subdivision (f), from being incorporated into the gang-murder special circumstance. (*Lee, supra,* at pp. 241–242.) We noted in *Lee* that in enacting Proposition 21, voters "clearly knew how to express the intent to freeze a statutory definition" by changing the ""lock-in"" date for determining the existence of

59

qualifying offenses under the "Three Strikes" law. (*Lee, supra,* at p. 243.) "Proposition 21 provided that 'for all offenses committed on or after the effective date of this act, all references to existing statutes in [sections 667, subdivisions (c)-(g), and 1170.125] are to those statutes as they existed on the effective date of this act, including amendments made to those statutes by this act.'" (*Ibid.*) Given these express time-specific references, we concluded that "had the voters also intended section 11 of Proposition 21 to make a time-specific incorporation of section 186.22, subdivision (f), they would 'have said so in readily understood terms.'" (*Ibid.*)

We find our reasoning in *Lee* to be persuasive and apply it here. Assem. Bill No. 333 is not unconstitutional as applied to the gang-murder special circumstance. The jury's true finding regarding the gang-murder special circumstance allegations under section 190.2, subdivision (a)(22) must be reversed and remanded.

## X. RESTITUTION AWARD.

Appellant contends the record does not support the restitution award, and the trial court failed to make a clear statement of the calculation method used. Further, he argues, the documents on which the trial court relied do not support the order, and counsel was ineffective for failing to object to those documents. Respondent asserts appellant forfeited this challenge, and in any event, there was no error in calculating restitution.

### A. Factual Background.

At the sentencing hearing, the prosecution introduced standard restitution form documents seeking a restitution award of $11,098.14 ($5,000, the "upper limit" for funeral expenses, for

Washington's funeral expenses and $6,098.14 for Baptist's lost income).

At the July 15, 2021 restitution hearing, the prosecution stated it was seeking direct restitution to the victim. Appellant's counsel stated, "we're not contesting what is in their request." However, appellant stated he did not agree to the amount of restitution. In response, the court stated, "the [P]eople may prove it up at this time." The prosecution submitted two documents, both of which were entered as exhibits. One indicated $5,000 for funeral and burial expenses for victim Mykiel Washington, and the other document indicated income loss in the amount of $6,098.14. The court stated, "I have considered it and I do find that the amount will be justified, and that will be ordered."

### B.    Discussion.

Section 1202.4, subdivision (f)(3)(H), provides "the restitution order shall be prepared by the sentencing court, shall identify each victim and each loss to which it pertains, and shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." A trial court may compensate a victim for any economic loss which is proved to be the direct result of the defendant's criminal behavior. (*People v. Henderson* (2018) 20 Cal.App.5th 467, 472–473.) "Restitution may be imposed in such cases only to the extent the defendant's criminal conduct played a 'substantial factor' in causing the victim's economic loss. [Citation.] To be a substantial factor, the defendant's criminal conduct must be more than a 'trivial or remote' factor contributing to the victim's loss, but it need not be the 'sole' cause of the loss." (*In re S.O.* (2018) 24 Cal.App.5th 1094, 1101.)

"At a victim restitution hearing, a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. [Citations.] 'Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim." (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.) No abuse of discretion will be found where there is a rational and factual basis for the amount of restitution ordered, and the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt. Section 1202.4 does not, by its terms, require any particular kind of proof. (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542–1543.) We review a restitution order for abuse of discretion. (*People v. Millard, supra,* 175 Cal.App.4th at p. 26.)

Here, the victims submitted restitution requests on standard forms specifying an upper and lower limit for such requests. Neither of these amounts is outside the specified limits, supporting a rational basis for the awards. Further, the amounts were not challenged by appellant on any basis other than that he disagreed. On this record, we find no abuse of discretion.

## DISPOSITION

The gang enhancements, gang-related gun enhancements, and special circumstance findings are reversed. In all other respects, the judgment is affirmed. On remand, the prosecution shall have the option to retry the appellant on these allegations, and the trial court shall resentence appellant.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, P. J.

We concur:

COLLINS, J.

MORI, J.